UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CERTEGY TRANSACTION
SERVICES, INC.,

    Plaintiff,

v.                                        Case No.  8:06-cv-555-T-24 TBM

TRAVELERS EXPRESS COMPANY,
INC., ET AL.,

    Defendants.
_____/

## ORDER

This cause comes before the Court on the parties' cross-motions for summary judgment (Doc. No. 61, 63) and responses thereto (Doc. No. 64, 68).

**I.  Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted).  The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  See id. (citation omitted).  When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

**II. Background**

This dispute arises in connection with Plaintiff Certegy Transaction Services, Inc.'s ("Certegy") purchase of all of the stock of Defendant Travelers Express Company, Inc.'s[1] ("Travelers") subsidiary, Game Financial Corporation ("Game"). Game provides quasi-cash advance services at casino gaming facilities, which means that Game provides casino patrons with immediate cash access from the casino gaming floor.

At a closing in March of 2004, Certegy paid Travelers approximately $43 million to acquire the stock of Game. The parties' stock purchase agreement contained a purchase price adjustment clause that retroactively reduced the purchase price for Game if certain customers terminated their contract with Game within a specified period. One of those customers was MGM Grand Hotel, Inc. ("MGM").

Game had long-term cash advance contracts with a number of different casino customers, including MGM. On December 19, 2000, Game and MGM executed a contract ("MGM Contract") whereby Game became the exclusive supplier of cash access services to MGM and its affiliated properties. The MGM Contract was effective for three years and would thereafter "renew for consecutive sixty (60) day periods unless one party [gave] the other sixty (60) day written notice of cancellation." (Doc. No. 61, Ex. 11).

While Travelers and Certegy were negotiating the stock purchase agreement, the MGM Contract was nearing the end of its initial three-year term, and Game was attempting to renew that contract (along with three other customers' contracts). As a result, Travelers and Certegy

---

[1] Travelers merged into Defendant MoneyGram Payment System, Inc. ("MoneyGram"), effective December 31, 2005, leaving MoneyGram as the surviving entity. Prior to the merger, MoneyGram was a subsidiary of Travelers. As used herein, Travelers refers to both Travelers and MoneyGram.

agreed that they would include a purchase price adjustment provision in the stock purchase agreement that would reduce Certegy's purchase price if any of the four customers terminated their contracts with Game by a specified date. With regards to the MGM Contract, the stock purchase agreement initially provided that Travelers would refund Certegy $6 million if MGM "terminate[d]" its contract with Game at any time on or before the first anniversary of the closing date of the stock purchase agreement.

At the time of the closing of the stock purchase agreement, the MGM Contract was operating under the sixty-day automatic renewal clause. Two months after the closing, Certegy received news that a competitor of Game submitted a very low bid to MGM, making it likely that MGM would terminate its contract with Game if Game did not substantially sweeten its renewal offer.

Certegy attempted to sweeten the renewal offer by offering MGM an $8.5 million signing bonus if it renewed its contract with Game, and Travelers agreed to contribute up to $3.5 million of the signing bonus. Due to internal delays at MGM, Certegy requested, and Travelers agreed to, two extensions to the purchase price adjustment period. The first extension was memorialized in March of 2005 and extended the purchase price adjustment period to July 1, 2005 and also extended to July 1, 2005 Travelers' obligation to contribute up to $3.5 million of the signing bonus if MGM renewed its contract with Game. (Doc. No. 63, Ex. 27).

Thereafter, at the end of May or early June of 2005, Certegy and Travelers discussed a second extension to the purchase price adjustment period. The parties agreed to extend the purchase price adjustment period and the period during which Travelers had an obligation to contribute to the signing bonus to November 30, 2005, and they also agreed to reduce the

purchase price adjustment for MGM to $4.8 million. (Doc. No. 61, Ex. 16).

After this second amendment to the purchase price adjustment period, the pertinent language of the stock purchase agreement, as amended, read as follows:

> If MGM Grand Hotel, Inc. ("MGM") terminates its existing Contract with a Game Entity at any time on or before the close of business on November 30, 2005, then the customer based adjustment to the Purchase Price shall be the amount of $4,800,000.00. . . .
>
> \*   \*   \*
>
> If, however, after such notice to exercise any right [MGM] may have to terminate is given, [MGM] revokes this notice or enters into a similar agreement with Certegy or any of its Affiliates (including any Game Entity) to provide such services within three (3) months of its Contract termination, . . . then Certegy shall immediately pay to Travelers an amount equal to the Purchase Price Reduction associated therewith.

(Doc. No. 61, Ex. 12, 16).

MGM continued to do business with Game under the automatic renewal provision of the MGM Contract when the second amendment to the stock purchase agreement went into effect. However, on November 11, 2005, MGM sent Certegy a letter stating that it was giving "official notice of [MGM's] intent to terminate services" under the termination provision of the MGM Contract, effective December 12, 2005[2] for one property and January or February of 2006 for the remaining properties. (Doc. No. 61, Ex. 18). As a result, Certegy requested that Travelers pay the $4.8 million purchase price reduction due to the termination of the MGM Contract.

Travelers refused to pay the $4.8 million, and Certegy filed suit. In Count I, Certegy asserts a breach of contract claim, and in Count II, it asserts a breach of implied contract/unjust enrichment claim. (Doc. No. 39). Currently pending before the Court are the parties' cross-motions for summary judgment.

---

[2]Despite the sixty-day notice of termination provision in the MGM Contract, the parties thereafter agreed to a lesser notice period for one of MGM's properties.

4

### III. The Parties' Motions for Summary Judgment

Certegy moves for summary judgment on its breach of contract claim, arguing that under the plain language of the stock purchase agreement, Travelers owes Certegy $4.8 million due to MGM giving notice on November 11, 2005 that it was terminating the MGM Contract. Travelers opposes the motion and has filed its own motion for summary judgment, arguing that under the plain language of the stock purchase agreement, there is no purchase price reduction, because MGM's termination of its contract did not become effective until after the November 30, 2005 deadline.

The initial interpretation of a contract is a matter of law for the Court to decide.[3] See Israel v. Surinder Chabra, 418 F. Supp.2d 509, 518 (S.D.N.Y. 2006)(citations omitted); Beekman Investment Partners, L.P. v. Alene Candles, Inc., 2006 WL 330323, at *3 (S.D.N.Y. Feb. 14, 2006)(citations omitted); Fuddruckers, Inc. v. Fudpucker's, Inc., 436 F. Supp.2d 1260, 1269 (N.D. Fla. 2006); Beverly Hills Condominium 1-12, Inc. v. Aspen Specialty Ins. Co., 2007 WL 1183939, at *3 (S.D. Fla. 2007)(citations omitted). The first step for the Court is determining whether the contract provision at issue is ambiguous. See Israel, 418 F. Supp.2d at 518 (citations omitted); Beekman, 2006 WL 330323 at *3 (citations omitted); Cartaya v. Coastline Distribution, 937 So. 2d 700, 701 (Fla. 1st DCA 2006)(citation omitted). If the provision at issue is ambiguous, and thus susceptible to more than one reasonable interpretation, then the Court may look to extrinsic evidence of the parties' intent. See Israel, 418 F. Supp.2d at 518 (citations omitted); Beekman, 2006 WL 330323 at *3; Okeechobee

---

[3]The parties dispute whether Florida or New York law applies to the stock purchase agreement. The Court does not need to resolve this issue at this time, because the relevant contract law applied in this case is the same under both Florida and New York law.

Landfill, Inc. v. Republic Services of Fla., L.P., 931 So. 2d 942, 945 (Fla 4th DCA 2006)(citations omitted). However, if plain language of the provision at issue is clear and unambiguous on its face, then the intent of the parties must be gleaned from within the four corners of the contract and not from extrinsic evidence. See Israel, 418 F. Supp.2d at 518-19; Beekman, 2006 WL 330323 at *3 (citations omitted); Cartaya, 937 So. 2d at 702 (citations omitted); Garcia v. Tarmac American Inc., 880 So. 2d 807, 809 (Fla 5th DCA 2004)(citation omitted). The Court must consider the contract as a whole rather than viewing specific provisions in isolation, and a contract should be interpreted so that no portion of the contract is rendered meaningless. See International Klafter Co., Inc, v. Continental Casualty Co., Inc., 869 F.2d 96, 99 (2d Cir. 1989)(citation omitted); See Israel, 418 F. Supp.2d at 519 (citation omitted); Beekman, 2006 WL 330323 at *4 (citation omitted); Moore v. State Farm Mutual Auto. Ins. Co., 916 So. 2d 871, 877 (Fla. 2d DCA 2006)(citations omitted); Lalow v. Codomo, 101 So. 2d 390, 393 (Fla. 1958)(citations omitted); Fuddruckers, Inc., 436 F. Supp.2d at 1269 (citation omitted). If the Court finds that the provision at issue is unambiguous, the meaning of the provision may be determined on a motion for summary judgment. See Beekman, 2006 WL 330323 at *3 (citation omitted); Cartaya, 937 So. 2d at 701 (citation omitted).

Certegy and Travelers both contend that the provision at issue is not ambiguous, but they both interpret the provision differently. The fact that they propose different interpretations does not, in itself, render the provision ambiguous. However, the Court finds that the provision is susceptible to two differing, yet reasonable, interpretations. As such, the Court finds the provision to be ambiguous.

As previously stated, the provision at issue provides the following:

6

> If MGM Grand Hotel, Inc. ("MGM") terminates its existing Contract with a Game Entity at any time on or before the close of business on November 30, 2005, then the customer based adjustment to the Purchase Price shall be the amount of $4,800,000.00. . . .
>
> *   *   *
>
> If, however, after such notice to exercise any right [MGM] may have to terminate is given, [MGM] revokes this notice or enters into a similar agreement with Certegy or any of its Affiliates (including any Game Entity) to provide such services within three (3) months of its Contract termination, . . . then Certegy shall immediately pay to Travelers an amount equal to the Purchase Price Reduction associated therewith.

(Doc. No. 61, Ex. 12, 16).

Travelers focuses on the part of the provision that provides that if MGM *terminates* its contract with Game on or before November 30, 2005, then the adjustment to the purchase price is $4.8 million. Travelers argues that the word "terminates" in this sentence means that the termination of the MGM contract had to be *effective* by November 30, 2005 in order for the purchase price adjustment to be triggered. Travelers argues that the purchase price adjustment is not triggered by mere *notice* of termination that is given by November 30, 2005.

Certegy, on the other hand, argues that the Court must look at the contract as a whole. Specifically, it argues that the Court must read the provision at issue in its entirety, including the repayment portion, which provides: "If, however, after such notice to exercise any right [MGM] may have to terminate is given, [MGM] revokes this notice or enters into a similar agreement with [Game] . . . within three (3) months of its Contract termination, . . . then Certegy shall immediately pay to Travelers an amount equal to the Purchase Price Reduction associated therewith." (Doc. No. 61, Ex. 12). Certegy makes two arguments in support of its contention that the wording of the repayment provision shows that the word "terminates," as used in the prior sentence, means notice of termination.

7

First, Certegy points out that the repayment provision refers to "such notice," which it contends refers to the previous sentence regarding contract terminations that trigger a purchase price adjustment, and thus the word "termination" means that the customer gave notice that it was terminating its contract. As such, Certegy argues that MGM's notice of termination on November 11, 2005 was sufficient to trigger the purchase price adjustment, despite the fact that the termination became effective after November 30, 2005.

Second, Certegy argues that if the Court were to interpret the provision as Travelers suggests, it would render part of the repayment provision meaningless. The repayment provision provides that if MGM revokes its notice of termination of its contract, then Certegy must repay Travelers the purchase price adjustment that it had received. Certegy argues that if revoking a notice of termination triggers Certegy's obligation to repay the purchase price adjustment, then it follows that notice of termination triggers Travelers' obligation to pay the purchase price adjustment.

Certegy argues that if the Court followed Travelers' interpretation, this part of the repayment provision would be meaningless, because under Travelers' interpretation, its obligation to pay the purchase price adjustment to Certegy would not be triggered until the effective date of the termination of the MGM Contract. Certegy argues that if the obligation to pay a purchase price adjustment to Certegy was not triggered until the termination of the MGM Contract became effective, then there is no reason to include a repayment provision that provides that Certegy must immediately repay the purchase price adjustment if MGM revoked its notice of termination of the MGM Contract (because no purchase price adjustment would have been paid).

While Certegy's interpretation of the repayment provision is reasonable, there is an alternate interpretation: The repayment provision may refer to situations in which a customer gives notice of a termination that is going to become effective prior to the end of the purchase price adjustment period, and Travelers pays Certegy the purchase price adjustment prior to the effective date of the termination. For example, if a customer gave notice of its intent to terminate its contract on January 1, 2005, effective March 1, 2005, and Travelers paid the purchase price adjustment associated with that customer on February 2, 2005, and the customer revoked its notice of termination on February 15, 2005, Certegy would have been required to repay Travelers the purchase price adjustment that Travelers had paid to Certegy. Thus, the repayment provision can be read in a way that is consistent with both parties' definition of "terminates."

Because the word "terminates" is often used interchangeably when describing giving notice of the termination of a contract and when describing the date on which the termination of a contract becomes effective, and given that the repayment provision can be interpreted in a manner that supports both definitions of "terminates," the Court finds that the purchase price adjustment provision is ambiguous.

The parties also argue that the events that occurred prior to and after the execution of the stock purchase agreement and the amendments thereto support each of their interpretations of the purchase price adjustment provision. For example, the fact that Travelers agreed twice to extend the purchase price adjustment period at times shortly before the period was about to expire is very compelling evidence that the parties intended that *notice* of termination prior to the end of the purchase price adjustment period triggered Travelers' obligation to pay the purchase price

adjustment, even if the termination became effective after the end of the period.

Specifically, since the MGM Contract required sixty-days notice for the termination to become effective, Certegy argues that it made no sense for Travelers to extend the purchase price adjustment period to July 1, 2005 and again to November 30, 2005, since MGM had not already given notice that it was terminating its contract. For example, if MGM had not given notice that it was terminating its contact in January of 2005, and the original purchase price adjustment period ended in March of 2005, it would appear that there would be no reason for Travelers to agree in February of 2005 to extend the purchase price adjustment period to July 1, 2005. Likewise, if MGM had not given notice that it was terminating its contact by May 1, 2005, and the purchase price adjustment period was ending on July 1, 2005, it would appear that there would be no reason for Travelers to agree in May or June of 2005 to extend the purchase price adjustment period to November 30, 2005. Under both scenarios, Certegy argues that Travelers was extending the period during which it could be liable for the purchase price adjustment when the current period during which it would be liable was about to expire and would have resulted in Travelers completely avoiding any obligation to pay the purchase price adjustment or the signing bonus.

Certegy has put forth evidence that the sixty-day notice period for contract terminations exists in order to protect the customer, because converting to another vendor to provide cash access services takes time. (Doc. No. 63, Ex. 4). Certegy contends that on June 29, 2005, the parties agreed to extend the purchase price adjustment period from July 1, 2005 to November 30, 2005. (Doc. No. 63, Ex. 31). Since the conversion process takes time to complete, Certegy argues that it makes no sense that Travelers would agree on June 29, 2005 to extend the purchase

price adjustment period from July 1, 2005 to November 30, 2005 if the effective date of the termination triggered the obligation to pay the purchase price adjustment, because by June 29, 2005, it was clear that if Travelers waited just two more days, Travelers would have been under no obligation to pay the purchase price adjustment or the signing bonus. The only reason for entering into the extensions, Certegy argues, is because *notice* of termination triggered Travelers' obligation to pay the purchase price adjustment, and MGM easily could have given notice that it was terminating the MGM contract at any time.

Certegy has made very persuasive arguments that reasonably and logically explain the parties' behavior. However, Travelers has pointed to evidence that the second extension was agreed to on some unidentified date "long before" June 29, 2005,[4] that Certegy could have waived the sixty-day notice requirement, that conversions to another vendor could sometimes happen "in compressed periods," that in the past Travelers had completed a conversion "in days," perhaps "over a weekend," and that it would be "operationally possible" for MGM to terminate its contract with Game and have the termination become effective prior to a new vendor providing the cash access services for MGM's casino patrons. (Doc. No. 64, Ex. 22, 23, 24). Since the Court cannot weigh the evidence on a motion for summary judgment, the Court must find that there are issues of fact that preclude summary judgment in this case.

**IV. Conclusion**

Accordingly, it is ORDERED AND ADJUDGED that:

(1) Travelers' Request for Oral Argument (Doc. No. 65) is **DENIED**;

---

[4] However, Travelers submitted an email *dated June 14, 2005* in which Certegy requested the second extension to the purchase price adjustment period. (Doc. No. 64, Ex. 33). Thus, there is evidence that the parties did not agree to the second extension prior to June 14, 2005.

11

(2)   Certegy's Motion for Summary Judgment (Doc. No. 63) is **DENIED**; and

(3)   Travelers' Motion for Summary Judgment (Doc. No. 61) is **DENIED.**

**DONE AND ORDERED** at Tampa, Florida, this 18th day of October, 2007.

SUSAN C. BUCKLEW
United States District Judge

Copies to: Counsel of Record